Filed 2/18/22  P. v. Neith CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALFRED JACOB NEITH,<br><br>Defendant and Appellant. | F079425<br><br>(Super. Ct. No. BF171546A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

Eric E. Reynolds, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Jennifer Oleksa, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Alfred Jacob Neith stands convicted by jury of one count of assault with a firearm pursuant to Penal Code section 245, subdivision (a)(2).[1,2] The jury also found true a great bodily injury (GBI) enhancement under section 12022.7, subdivision (a), and a firearm enhancement under section 12022.5, subdivision (a). Defendant was sentenced to an aggregate determinate term of nine years.[3] (§§ 245, subd. (a)(2), 12022.5, subd. (a), 12022.7, subd. (a).) The court also imposed a $300 restitution fine, and court assessments in the amount of $70.

Defendant appeals the conviction on grounds the People failed to prove beyond a reasonable doubt that he did not act in self-defense or in defense of others in shooting the victim, the trial court erroneously and prejudicially excluded portions of the victim's interview with police, and the trial court erred by failing to consider defendant's inability to pay the fines and fees assessed at sentencing.

For the reasons discussed below, we conclude there was substantial evidence to support the verdict, any error by the trial court in excluding the victim's police interview was not prejudicial, and the argument under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) regarding defendant's ability to pay the fines and assessments is forfeited. Defendant's ineffective assistance of counsel claim regarding defense counsel's failure to object under *Dueñas* fails because the record does not demonstrate defense counsel's

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant was found not guilty of attempted murder on count 1; the jury was unable to reach a verdict on the lesser included offense of attempted voluntary manslaughter, a mistrial was declared as to that count, and it was later dismissed by the prosecution.

[3] The court imposed the middle term of three years pursuant to section 245, subdivision (a)(2), imposed the low term of three years for the firearm enhancement under section 12022.5, subdivision (a), and imposed the three-year term for the GBI enhancement under section 12022.7, subdivision (a).

performance was deficient or that defendant suffered any prejudice. The judgment is affirmed.

## BACKGROUND

At around 6:45 p.m. on the evening of March 9, 2018, officers responded to a 911 call to a location in Lake Isabella. Kern County Sheriff's Deputy Tommy Robins was the first emergency responder to arrive. He found someone, later identified to be Marvin S., lying in the roadway across from what was later identified as defendant's residence. There were several people around Marvin. Marvin had been shot four times, and someone was applying pressure to his wounds. Marvin told the officer that "'Al shot me.'"

Deputy Robins saw defendant standing near the door of his residence and asked him to walk over to the patrol car. Defendant was calm and cooperative; he told Robins there was a firearm on the bench near the house. While defendant and Robins walked back to Robins's patrol car, Officer Jonathan Nunez arrived. Robins told Nunez about the firearm on a bench near the front of defendant's residence. After placing defendant in his patrol car, Robins went to check on the victim. Robins worked to secure the scene and saw a beer bottle lying about 20 feet from Marvin.

Deputy Nunez found a nine-millimeter Glock handgun on a patio bench seat right next to defendant's front door. There were no bullets in the firearm, but there was a magazine next to the firearm that contained six rounds. He saw Marvin briefly, but did not notice any blood coming from his nose—paramedics were providing aid.

Deputy Kent Sakamoto was next to arrive at the scene. He saw numerous civilians in the location, but Marvin had been taken to the hospital. He spoke with defendant's wife, Mary A. He did not see any injuries on her, but she was distraught. She mentioned she was struck just before the shooting, she landed on the ground, and just when she looked up, she saw the flash of a muzzle and defendant was firing his gun. She

3.

was unsure with what she was struck or how, but she did not indicate she lost consciousness.

Sakamoto also found four spent nine-millimeter shell casings near Marvin. He participated in a recorded interview of defendant that took place close to midnight. Sakamoto did not participate in the interview of Marvin at the hospital.

Sarah is married to Joe. They live in the same neighborhood as defendant, and she met defendant because their respective children hung out. Sarah had seen defendant's drone flying near her house about five times—it was generally hovering in front of her window; it had also come inside the netting of the kids' trampoline in her yard. She called the sheriff's department and reported it—she knew it was defendant who was flying the drone because his child was bragging about it to her children at school.

On the day of the shooting, Marvin was at Sarah and Joe's house, and he had been drinking—Sarah was unsure how much. She saw Marvin and her husband leave the house, and she knew Marvin was frustrated, ostensibly about the drone defendant had been flying. They were going to a neighbor's house—Joe told Sarah they were going to Tim's house. Sarah knew Marvin had been down to defendant's house one time before that—sometime in the afternoon, when she was not present. Tim's wife, who lives close to defendant, had called Sarah to tell her Marvin had been to defendant's house and asked if everything was okay. Sarah was aware there had been some kind of confrontation between Marvin and defendant earlier in the day. When Joe and Marvin left the house, they did not say anything to Sarah except that they were going to see Tim.

At some point, Sarah's kids told her they heard some screaming, so she got in her car with Marvin's wife, Ellen. They rode together to defendant's house. When they arrived, Sarah could see Marvin, Joe, defendant, and defendant's wife, Mary, were arguing. As Sarah exited the car, defendant was yelling at Marvin and Joe, and he was holding a gun behind his back. Defendant was accusing Joe and Marvin of being rats and

cop-callers, that they needed to mind their own business, and he could fly his drone "where the F he pleased."

When Sarah exited the car, Mary charged at Sarah and wanted to fight her. Mary had her fist pulled back and was saying things like she was going to "beat" Sarah's "ass" and accused Sarah of calling law enforcement about the drone. Defendant grabbed Mary by the back of her hoodie and pulled her away from Sarah. Ellen also got out of the car and went to Marvin—she pleaded with him to go home and told him the altercation was not worth it. There was about seven feet between defendant and Marvin at that point. Sarah never heard Marvin threaten defendant, nor did she hear Joe say Marvin had a gun. Joe kept saying it was ridiculous and they should just leave, but Marvin would not listen.

When Mary was pulled away from Sarah by defendant, Mary then ran around behind defendant, charged Marvin, and hit Marvin in the nose. Marvin put up his hands to block her hit because she turned around to hit him again. When he blocked her from striking him, she fell; then defendant started shooting. Sarah never saw Marvin move toward Mary after she came toward him, all he did was try to block his face with his right hand. He never swung the beer bottle at Mary because after she hit him the first time, the beer bottle fell out of his left hand and hit the ground near where he was standing. Mary had not fallen all the way to the ground when shots were fired. The first two shots were immediate, then there was a pause of a second, followed by two more shots. All the shots were fired at the front of Marvin's body—he was not shot in the back. Sarah thought defendant had his right hand behind his back right up until he fired the weapon at Marvin.

After shooting Marvin, defendant walked back to his house, handed his mother— who lives two houses away—the gun, and then defendant remained in his yard laughing. Sarah called 911 while she was trying to get the neighbors to bring some towels or rags to help Marvin.

According to Joe, he had met defendant before the shooting—their respective children had been friends, but the children had a falling out before the shooting. Joe saw

5.

the drone in his yard in March 2018 about 15 times.  It would come near the kids'
trampoline, and it would look into windows.  It was a black, square drone with four
propellers.

On the day of the shooting, Marvin came to Joe's house around 4:30 or 5:00 in the
evening.  Joe had a couple of cocktails and Marvin had a couple of beers.  Marvin told
Joe about the confrontation between Marvin and defendant earlier in the day; Joe knew
Marvin was upset with defendant.  Joe decided to see his friend Tim, and Marvin
followed along.  Joe thought since Tim still talked to defendant, maybe he would know
how to diffuse the situation.  Joe denied they headed to defendant's house; they went to
Tim's house, but Tim was not home when they knocked on his door.  Tim's house was
close to defendant's home, however, and Marvin started yelling toward defendant's
house when he was out on the street; defendant came outside and they proceeded to argue
about the drone.  It was just defendant, Marvin and Joe in the street at that time, until
Sarah and Ellen showed up a bit later.

The argument between defendant and Marvin was loud and lasted about five
minutes—they were both threatening to beat each other, but Joe never heard anyone say
anything about a gun.  Joe noticed defendant had his hand behind his back, but Joe never
saw a gun until defendant fired it; Marvin did not have a gun.  There was no physical
altercation until Mary ran up and punched Marvin in the face.  Marvin reacted like he had
been hit, but he did not make a move to hit her back.  When Mary reached up toward
Marvin again, Marvin put his arm up and tried to block Mary.  Marvin had been holding
a beer in his left hand, but when Mary hit him initially, he dropped it.

Joe never saw Mary try to strike Sarah, and he did not see whether defendant
grabbed Mary.  Joe was perhaps 30 feet from Marvin and defendant when defendant
started shooting; Joe had started to leave and was walking away when the gun went off.
Joe heard three shots fired with a pause after the first shot.  Between the first shot, and the
next two shots, Joe heard Marvin say, "'That motherfucker shot me.'"

6.

Marvin had no gun at home that Joe was aware of—he had never seen Marvin with a gun. After Marvin had been shot, Joe ran back to his house for medical supplies. On his way, his wife's friend said the ambulance was on its way, so Joe did not go back to the scene until he learned there was a deputy there who wanted to take his statement.

Ellen, Marvin's wife, had never seen a drone flying around the neighborhood, but she knew people were talking about it. On the day of the shooting, Marvin had been drinking beer, but she did not know how many he had. He went over to Sarah and Joe's house, but Ellen did not go to Joe and Sarah's house until later in the afternoon. Marvin never mentioned going over to defendant's house earlier in the day. She did not know who defendant was prior to the day of the shooting.

At some point, Joe and Marvin left Joe's house, but Ellen was already back home. Sarah came screaming into Ellen's house that there was going to be a fight, and Sarah told Ellen to come with her. They got in the car and drove to the street where Marvin and defendant were engaged in a verbal altercation; Mary was standing close to the men in the middle of the street. Ellen did not see Mary come toward Sarah when she got out of the car; she did not see defendant grab Mary and pull her away from Sarah; Ellen was focused on Marvin. She wanted him to get out of there because he was being loud and angry. She begged him to come home, but Marvin told her to get out of the way. Ellen later told a deputy she stepped away from Marvin at that point because she felt that if she got in the way it would make him angrier.

Ellen saw Mary attack Marvin a few minutes after they got there—Mary hit Marvin in the nose with her fist. The beer in Marvin's hand went flying, and Marvin made no attempt to retrieve it. Instead, Marvin put his right arm up across his face, and Mary ran back toward him again, but she ran into Marvin's arm. Defendant was standing close by with his hands by his side, but when Mary went down after she tried to strike Marvin the second time, Ellen saw defendant put his arm behind his back, and then fired his gun at Marvin four times. Ellen remembered a pause of a few seconds after the first

7.

shot, and then three more shots were fired in succession. After he was shot the first time, Marvin exclaimed, "'[t]he motherfucker shot me.'" Marvin never tried to move toward defendant after the first shot.

Neither Ellen nor Marvin have a gun; Ellen has never seen Marvin with a gun in all the time she has known him. Ellen never heard anyone say anything about a gun before the shooting, and the first time she saw a gun that day was when defendant started shooting. Ellen did not see where defendant went after he fired the shots; she had run to Marvin to help stop the bleeding. Joe said he was going to get bandages and come right back; she never saw anyone hand Joe anything. Joe never made it back before the ambulance arrived, which came only minutes after Joe left. Ellen did not stay at the scene after Marvin was taken to the hospital—she ran home.

Defendant's neighbor, Michael, saw portions of the altercation from his yard. On the day of the shooting, about 12 to 15 people had been coming down his street and travelling back and forth near defendant's house—Marvin was always among them. Michael heard Marvin yelling toward defendant's house around noon. Later, there were people congregated on the street near defendant's house for about an hour before defendant came out. There were many individuals on the street, including minors. During an argument that ensued when defendant arrived, Michael heard someone say, "'get my gun.'"

Defendant told Marvin to leave and to get away from him; the two were arguing loudly back and forth. At one point, Michael heard a loud, slapping noise; he saw defendant then run into his house, and he came back out about 90 seconds later. He heard defendant yell after he came out of the house, "'[g]et away from me[,] I've got a gun.'" Marvin was standing about six feet away from defendant, and when Marvin took a step forward and seemed to reach his hand from behind his hips, Marvin then started to extend his arm forward. Michael could not tell if Marvin was holding anything in his hand, but Marvin's mannerisms suggested he was. It was then that defendant fired his

8.

gun. Michael heard Marvin ask, "'[w]here is my gun?'" Michael saw Mary there; he did not see her get hit, but he saw her trying to get back up—it was seconds after she was trying to get up that the shots were fired. Michael heard three consecutive shots; he could not see where defendant had grabbed the gun; Michael heard Marvin say, "'I've been shot.'"

Michael thought Marvin had been standing with his left hand behind his left buttock in the minutes before the shooting. He never saw an individual flee the scene, and he never saw Marvin give a gun to anyone. Defendant's mother then came out briefly; Mary went back into the house, but defendant stood out there—he was still in the street when officers arrived.

According to Marvin, a drone had been flying around the neighborhood in March 2018—he had seen it about three or four times. It was flying over houses and really close to Joe's house and his kids. Marvin knew it was defendant's drone because he had seen defendant with it before.

On the day of the shooting, Marvin had driven by defendant's house to tell him to quit flying his drone in Marvin's front yard. Both defendant and his wife were in the yard when Marvin drove by in his truck. He never got out, and he did not have to raise his voice to get their attention. Defendant and his wife came over to Marvin's truck. He asked them to "fucking quit" flying their drone. But defendant's wife began "[s]creaming and yelling," and Marvin drove away. At some point before the shooting, defendant drove by Joe's house hollering and calling them names.

Later that day, Joe wanted to go to defendant's house while he and Marvin were walking over to Tim's house. Marvin and Joe started yelling on the street toward defendant's house. Defendant and his wife came out of their house, Marvin and defendant began arguing, and that was when Ellen and Sarah showed up. Ellen tried to get Marvin to leave, but Mary came around and "blind-sided" him, striking him in the nose. He dropped the beer bottle he was holding in his left hand. Mary moved to strike

9.

him again, but he blocked her with his arm. He did not know if Mary fell; the next thing he remembered was being shot. He remembered the first shot, but not the subsequent three. He remembered saying to his wife, "'[t]hat fucker just shot me.'"

He never tried to hit Mary with the beer bottle, and he never tried to punch or strike her. He did not have a gun with him; he never asked where his gun was; he did not recall anyone at the argument ever saying they had a gun. He did not see defendant go back into his house, and Marvin could not remember if defendant ever had his arm behind his back. Marvin denied taking a step toward defendant when Mary came in to hit Marvin again. After Marvin extended his arm to block Mary, shots were fired. He was hit by four bullets to the front of his body; he had to go through six surgeries and was in the hospital for nearly two months. He had no recollection of speaking with an officer while he was in the hospital in April 2018, and he did not remember if he ever complained to the officers about Mary hitting his nose. He admitted he has a limited memory of the shooting.

Testifying on defendant's behalf, Mary explained she had purchased the drone for her son and husband in February 2018, and she had been present when they had flown it around the neighborhood on about eight or 10 occasions. The first time she ever saw Marvin was on the day of the shooting. Marvin drove over to their house around 1:00 to 1:30 that afternoon, parked his car in the dirt near their yard, yelled at them about the drone, and called them names. Defendant told Marvin they were not doing anything wrong, but Marvin kept yelling at them he would be back and would teach them a lesson. Mary threatened to call the police, and Marvin left. Later that afternoon, defendant and Mary had taken the dog to the vet and were away from the house until about 6:00 p.m. that evening. They never drove by Joe's house that afternoon.

When they were getting ready for dinner, Mary heard the dogs bark and sent defendant to find out why. He went outside twice to check; Mary's phone started to ring and someone was telling her there were two men outside her house cursing and

10.

screaming. Then Mary heard defendant's voice outside; she went outside and saw defendant asking two men what they were doing on his property. She saw Marvin near defendant's truck, but could not see anyone else because it was dark outside. Marvin kept saying he was back to teach defendant a lesson. Marvin threatened to shoot defendant, and then she heard Joe speak. He was telling Marvin to leave, but Marvin was not listening to him. She saw that Marvin had his hand behind his back, but Mary could not see a gun. When Marvin's hand came out, though, she saw that it was a beer bottle. The men had moved out into the street while they were arguing, and a car arrived.

A group of people jumped out from the car, including Sarah, another woman, and three men in the backseat. Mary denied threatening Sarah; instead, Sarah was upset and confronted Mary. Mary stayed next to defendant, while Marvin was a foot or two in front of defendant. Mary told Sarah that if she did not back up, Mary would knock her out. Sarah threatened Mary in return. At this point, Mary saw that defendant and Marvin were nose to nose; Mary put one arm between them and went to grab defendant to push him back. Suddenly, Mary felt pain on top of her head; she never struck or slapped Marvin or ran toward him. She never touched Marvin.

When she felt the pain, she passed out, and the next thing she saw was the last spark of a gunshot. While on the ground, she saw Marvin sitting down because he had been shot. Defendant's mother yelled that defendant needed to get Mary up. Defendant helped Mary into the house, and he helped her dial 911 on the phone. Mary told the 911 operator she was struck in the face, and that Marvin had pulled a beer bottle from behind him really quickly, she thought it was a gun, and that was when she was knocked out. After the 911 call, she and defendant waited for the police to arrive. Defendant's mother came to get the children, and she took them back to her house.

Charles, defendant's stepfather, lives two houses away from defendant. On the night of the shooting, he heard loud voices on the street. He and his wife went to the front porch to see what was going on, and they saw about 12 people—adults and

11.

children—on the street. Defendant was arguing with someone Charles did not know. He heard defendant tell that person to "'[g]et out of here.'"

The person arguing with defendant was animated, with his hands in the air, although Charles could not see anything in his hands. The visibility was poor because it was dusk and he was not able to see much. Charles went back into the house because he did not want to get involved. About 10 minutes later, he heard three consecutive gunshots. He went to the bathroom window and saw a man sitting on the ground, and someone was propping him up. There were a few other people concerned around him. He heard someone say, "'[w]here's the gun?'" Charles and his wife went out on the porch, and his wife went to get her grandchildren from defendant's house. Then they all went inside and he did not hear or see anything else.

Defendant's mother, J., indicated she and defendant's family were together the morning of the shooting and had gone fishing. After they arrived home, there were people screaming up and down the street with their vehicles, tires squealing. Later in the evening, J.'s husband indicated to her there was some type of commotion outside. They went to the door and saw something happening in front of defendant's house across the street. She heard a lot of yelling from both male and female voices. She saw one woman trying to get a man to leave, but she was not successful as the man was focused on defendant. Another woman was exchanging words back and forth with Mary.

J. had never met Marvin before that night; he was yelling and screaming at defendant in aggressive tones, and defendant was yelling back. More people showed up in a vehicle, and one woman started arguing with Mary. Then, all of the sudden, Mary dropped to the ground. J. did not see how it happened, but noted that Marvin was the closest person to Mary at that time. J. went into the house to find her phone to call 911 and that was when she heard shots fired. She did not see what happened right before the shots were fired, but she heard defendant say "'[b]ack up[, b]ack up,'" and then heard three or four consecutive shots. When she could not find her phone, she went back

12.

outside and got her grandchildren from defendant's house. She did not take a gun from defendant—she grabbed a diaper bag and formula. She heard someone yelling to "get this out of here" or "get it out of here." People scattered before deputies arrived. Defendant stayed in the street; he was in a daze.

A private investigator testified about the video footage that had been downloaded from defendant's drone. None of the video indicated it had been flown at eye level, and the only time it had been flying at a low level was when it was taking off or landing. He noted that he had reviewed Marvin's extensive medical records and nothing indicated Marvin had broken his nose that evening.

During the prosecution's rebuttal case, Deputy Sakamoto indicated he had spoken with Mary on the night of the shooting. She said she went outside because she heard defendant arguing, and she wanted to prevent him from fighting.

## DISCUSSION

### I.     Substantial Evidence Supports the Verdict

Defendant argues there is insufficient evidence to prove beyond a reasonable doubt that he did not act in self-defense, or in defense of his wife, in shooting Marvin. Defendant points to evidence that shows he acted in defense of his wife: defendant notes he told police he saw Marvin hit Mary in the face with a beer bottle, and that he then shot Marvin in fear for his and Mary's safety;[4] Marvin had been threatening to teach them a lesson earlier in the day, and he showed up at defendant's house after sunset with a group of people; and, once at the house, Marvin told defendant he was there to "kick [defendant's] ass."

"'Our task in deciding a challenge to the sufficiency of the evidence is a well-established one. "[W]e review the whole record in the light most favorable to the

---

[4]     Deputy Sakamoto interviewed defendant around midnight on the night of the shooting; a recording of that interview was admitted and played for the jury. Neither the interview recording nor a transcript was included in the record on appeal.

13.

judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.""" (*People v. Salazar* (2016) 63 Cal.4th 214, 242.) "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054.)

Defendant points to evidence presented to the jury indicating defendant acted in self-defense or defense of his wife and argues the evidence was insufficient to establish beyond a reasonable doubt he had not acted in self-defense in shooting Marvin. That argument, however, misapprehends the substantial evidence standard of review. This standard does not permit a reviewing court to determine whether substantial evidence might support the losing party's version of events (see *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582), nor does the reviewing court reweigh the evidence (*People v. Fultz* (2021) 69 Cal.App.5th 395, 416). So long as there is substantial evidence to support the verdict, the existence of contradictory evidence does not warrant reversal. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170 [that evidence might conceivably have been reconciled with a contrary finding does not warrant reversal where substantial evidence exists to support the verdict].)

As the evidence defendant highlights in his opening brief makes clear, there was substantial evidence to support a jury instruction on self-defense or defense of others. (See *People v. Lemus* (1988) 203 Cal.App.3d 470, 478 [if substantial evidence of self-defense exists, court must instruct sua sponte and let jury decide credibility of witnesses].) Thus, the jury was instructed as to the legal doctrine of self-defense pursuant to the pattern instruction under CALCRIM No 3470. The court instructed the jury that "[s]elf-defense is a defense to a[n] assault with a firearm. The defendant is not guilty of

14.

that crime if he used force against the other person in lawful self-defense or defense of another. The defendant acted in lawful self-defense or defense of another if: [¶] One, the defendant reasonably believed he or someone else was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully. [¶] Two, the defendant reasonably believed that the immediate use of force was necessary to defend against that danger. [¶] And three, the defendant used no more force than was reasonably necessary to defend against the danger."

The jury was also instructed that belief in future harm is not sufficient, but the jury could consider whether Marvin had threatened or harmed defendant in the past to determine whether the defendant's beliefs were reasonable. The jury was further instructed that if defendant used more force than was reasonable, defendant did not act in lawful self-defense or defense of another. The instruction reiterated it was the prosecution's burden to prove beyond a reasonable doubt defendant had not acted in self-defense or defense of others.

Defendant challenges whether there was substantial evidence to support the jury's conclusion, pursuant to this self-defense instruction, that defendant did not act in self-defense or defense of others in shooting Marvin. We conclude there was ample substantial evidence to support the jury's verdict.

Viewing the evidence in the light most favorable to the judgment, as we must, witness testimony indicated it was Mary who initiated the physical aspect of the confrontation by striking Marvin in the nose and that Marvin did not make any move to strike or hit Mary before he was shot by defendant. According to the testimony of Joe, Sarah, Ellen and Marvin, Mary struck Marvin without any *physical* provocation by Marvin; when Marvin was struck, the beer bottle he had been holding in his left hand fell to the ground. The beer bottle was later found, unbroken, near where Marvin was shot. These witnesses also testified Mary came back to strike him a second time, but Marvin put his hand in front of his face to block her from hitting him. When Marvin did this,

Mary ran into his arm and fell back—Marvin did not reach out and strike her, and he did not have the beer bottle in his hand to strike Mary with it. These witnesses also testified Marvin did not take any steps toward defendant when Mary fell, nor did he have a gun. At the moment Mary fell back, defendant started shooting. Sarah testified Mary was not even all the way to the ground when the shots were fired.

Joe, Ellen, and Sarah also testified there was a pause between shots, and that Marvin was already on the ground when additional shots were fired. During the pause between rounds, Joe testified Marvin exclaimed that he was shot. Ultimately, Marvin was shot four times in the front torso area. Mary did not complain to officers that her head hurt or that defendant hit her with the beer bottle.

From this evidence, even in the face of Mary's testimony presenting a different version of events, the jury was entitled to credit Joe's, Sarah's, Ellen's and Marvin's testimony. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 [testimony of a single witness is sufficient to support a conviction unless testimony is physically impossible or inherently probable].) Joe's, Sarah's, and Ellen's testimony that Marvin never physically advanced on Mary or defendant during the argument was neither impossible nor inherently improbable. Witness testimony indicated that after defendant's first or second shot, Marvin was on the ground; and, after a pause between gunshots and Marvin apparently going to the ground, defendant then fired the gun two or three more times. From this testimony, a rational jury could have concluded beyond doubt that defendant did not reasonably believe Mary was in imminent danger when he fired on Marvin, and that defendant had used more force than was reasonably necessary.

The fact that the jury could have credited different testimony and drawn different inferences from it—as defendant argues—does not render the verdict unsupported by substantial evidence. It was for the jury to evaluate and credit the witnesses' testimony as it wished (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1463 ["'A trier of fact may accept such witnesses as he wishes and reject others ....'"]), and we do not substitute our

16.

evaluation of the evidence for that of the trier of fact (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078).

In sum, there was substantial evidence from which a rational jury could conclude the prosecution had proven beyond a reasonable doubt defendant did not act in self-defense or the defense of others in shooting Marvin.

## II. Exclusion of Victim's Police Interview

Defendant argues the trial court's exclusion of Marvin's recorded police interview at the hospital resulted in prejudicial error.

### A. Background

On direct examination, Marvin testified he had seen defendant on two occasions before the argument that led to the shooting on March 9, 2018. Either on the day of the shooting or the day before, Marvin saw defendant when defendant drove by Joe's house calling them names and "hollering racial stuff" at them. On a second occasion, Marvin had driven to defendant's house, asked defendant to stop flying his drone, and defendant and his wife ran up to Marvin's truck and started yelling at him.

During the cross examination of Marvin, defense counsel attempted to introduce a recorded police interview of Marvin as impeachment evidence. The police interview took place on April 11, 2018, when Marvin was still in the hospital. A very short portion of the interview was played for Marvin to establish a foundation to admit the recording, but he testified he could not identify his voice on the recording and had no memory of the interview during his hospitalization. The prosecutor then requested a sidebar to discuss a hearsay objection to the recording.

At a bench conference, the prosecutor interposed objections that the interview contained hearsay and was irrelevant. Defense counsel explained that in the interview, Marvin told officers he had never seen defendant before the shooting, he had simply walked up to defendant's house, told him to stop flying the drone, turned away, and was then shot. He could not identify defendant when presented with a photographic lineup at

that time. Marvin also purportedly made racially derogatory statements about Asians, which defense counsel thought had not been captured by the recording.

In asserting these interview statements were relevant and admissible, defense counsel argued "this is [Marvin's] first interview with police officers and he basically does absolutely nothing wrong and then at that point turns around and gets shot. He also has almost no memory as to what appears to be or says this is all I remember as to anything [t]hat occurred prior. But then his memory seems to go back and forth in his preliminary hearing examination[;] remarkably his memory seems to be ten times better than what it was on this occasion. [¶] So[,] I am asking to play this to show what his memory was like at the time and as to what he told the officers. We're assuming that he was supposed to be truthful with the officers and his version is that he absolutely did nothing wrong at the time of the events and just turned around and got shot for no reason."

The trial court ruled that any racial epithets spoken by Marvin and captured by the recording were not relevant—both defendant and Marvin were White, and there was no issue in the case that involved racial animosity. As such, the court concluded any such language would be inflammatory, prejudicial, and would distract the jury from the relevant issues.

The prosecutor conceded the recording was relevant for impeachment purposes; but because Marvin did not remember the interview, there was no foundation laid to admit it. However, as the bench conference proceeded, the prosecutor agreed to stipulate to the foundation for the recording because the officer who conducted the interview was on medical leave.

The court asked counsel to review the transcript to determine what portions of the interview needed to be redacted. After discussing the recording again at length, and after both counsel had an opportunity to review the transcript, the court concluded the portion of Marvin's interview where he said he was shot as he walked away from defendant was

admissible. The court ruled defense counsel could "read into the record that this was by stipulation the statement that he gave to law enforcement at the hospital … [¶] … [¶] … that portion regarding … where he was shot can come in."

Defense counsel then sought to include the portion of Marvin's interview where he told officers he could not recall some of the events of the shooting. The court questioned whether that was particularly probative "in light of [Marvin's] current testimony regarding his limited memory. It's clear from his testimony that he has gaps in the events of the day [of the shooting]. I don't think that helps the defense either. So I will allow simply in by stipulation that portion of the previous testimony that [Marvin] indicates he was shot in the back." In response, the prosecutor asked if they were reading that interview excerpt as a stipulation "after or are we reading that now."

Defense counsel indicated he was unclear whether he would stipulate because "now we're putting in just one portion to which this guy [Marvin] gets to say he was shot in the back which takes away self-defense. That's why I need the entire audio."

Defense counsel and the court then had the following exchange:

"THE COURT: I don't understand how that then makes you need the entire audio.

"[DEFENSE COUNSEL]: Because we don't—the Court also is not sure where he said he was shot in here. And I wasn't too clear as well. And he is the one who would know where he was shot.

"THE COURT: Okay.

"[DEFENSE COUNSEL]: Now if he's clear about it being in the chest and the stomach, that's fine. I thought we talked about it. I thought he was clear about it and I thought he said the wound to the back which was shown was an exit wound. But I don't know if it was ever cleared up.

"THE COURT: Well, how does that then make the whole tape come in? Because you're getting in the part with which he is saying he was shot in the back. Of course[,] you might not want that in now. But I don't know how then that you're being prejudiced by not having the whole tape come in. I don't always get the nuance of the argument the first time around.

19.

"[DEFENSE COUNSE]: I've made my arguments.

"THE COURT: Okay. With that, the Court's made its ruling…."

When cross-examination resumed, Marvin confirmed he was shot four times in the front, torso area of his body, and that any wounds to his back represented exit wounds. Marvin repeated he was unable to recall speaking with officers while he was hospitalized or what he said during such an interview.

Defense counsel then elicited the following answers from Marvin:

"Q. So you would have no recollection that [at] the time of the shooting that you simply went up to [defendant] and said, [']hey, dude, put that thing up man.['] And then you turned to walk off and that's when you were shot?

"A. Yes.

"Q. You don't remember any of that. Is that right?

"A. I don't remember, no."

Defense counsel then allowed Marvin to review the transcript of the interview, but it did not refresh his recollection. Marvin could not remember the interview or whether he said anything during the interview about Mary hitting Marvin's nose just before the shooting; Marvin could not remember saying that Mary hit him on his nose; Marvin could not recall saying in an interview that, at the time of the shooting, they walked over to defendant's house, told defendant to put away the drone, and then turned around, walked off and got shot.

## B. Analysis

Defendant argues the trial court's exclusion of the recorded interview precluded him from being able to fully and effectively cross-examine Marvin and to present a meaningful and complete defense, violating defendant's federal constitutional rights under the Sixth and Fourteenth Amendments. Defendant also maintains Marvin's prior interview statements were plainly inconsistent with his trial testimony in several respects;

20.

thus, the recording was admissible under state law as prior inconsistent statements relevant for impeachment of Marvin.

A trial court's ruling on the admission or exclusion of evidence is reviewed for an abuse of discretion. (*People v. Gonzalez* (2021) 12 Cal.5th 367, 407–408.)

### 1. Constitutional Claims

As the People note, defendant's appellate claim that the exclusion of Marvin's police interview statements violated defendant's federal constitutional rights was forfeited by failure to object on constitutional grounds below. (*People v. Daniels* (2009) 176 Cal.App.4th 304, 320, fn. 10, citing Evid. Code, §§ 353, 354 ["An appellate contention that the erroneous admission or exclusion of evidence violated a constitutional right is not preserved in the absence of an objection on that ground below."]; see *People v. Boyette* (2002) 29 Cal.4th 381, 424 [constitutional claims relating to admission of photographic evidence were not preserved for appeal in a capital case because the defendant did not object at trial on those specific grounds].) But even considering the merits, defendant's constitutional claims fail. (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [if new arguments do not invoke new facts or legal standards but merely assert the court's act had additional legal consequence of violating the Constitution, they are not forfeited on appeal].)

Assuming the exclusion of the recording was evidentiary error under state law, "only evidentiary error amounting to a complete preclusion of a defense violates a defendant's federal constitutional right to present a defense." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4, citing *People v. Boyette, supra*, 29 Cal.4th at pp. 427–428.) Here, the challenged rulings "'merely rejected certain evidence concerning the defense.'" (*People v. Cowan* (2010) 50 Cal.4th 401, 473.) Moreover, defendant was permitted to cross-examine Marvin regarding his inconsistent statements about walking up to defendant's house, asking him to stop flying his drone, and then turning away and being shot by defendant. The court also clearly permitted defendant's counsel to read this

portion of the interview transcript into the record during cross-examination, but defense counsel elected not to do so. Even assuming defendant was erroneously precluded from introducing Marvin's prior statements to police that he had never met defendant before the shooting, that was only one portion of the interview. Exclusion of the recorded interview did not amount to a complete preclusion of a defense.

The exclusion of the interview recording also did not implicate defendant's right to confrontation under the Sixth Amendment. "Although the right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility, 'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross examination.'" (*People v. Quartermain* (1997) 16 Cal.4th 600, 623 (*Quartermain*), quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.) "A trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*Quartermain, supra*, at pp. 623–624.)

In this case, Marvin's trial testimony was more favorable to defendant's self-defense theory than Marvin's prior inconsistent statements to police. During his trial testimony, Marvin admitted he had seen defendant on two occasions before the shooting. Marvin testified he had gone over to defendant's house in his truck before the shooting and conceded he told defendant and Mary to "fucking quit" flying the drone. Marvin also testified he later saw defendant drive by Joe's house, yelling and calling them all names, and that is what led him and Joe to walk down to defendant's house to confront him, which is when the shooting occurred.

Marvin also testified he was the one who instigated the argument before the shooting by yelling towards defendant's house, and it was Marvin's yelling that prompted defendant and Mary to come out in their yard. He further testified he and defendant were

22.

still vehemently arguing when his wife Ellen arrived with Sarah, and Ellen tried to get him to leave. Finally, Marvin testified the wounds to his back were exclusively exit wounds.

Thus, while the prior police interview statements were clearly inconsistent with Marvin's trial testimony, the admission of the police interview would not have given the jury a significantly different impression of Marvin's credibility. The fact that his trial testimony was *more* favorable to the defense than his prior statements to police would not have given the jury a reason to doubt his trial testimony. This is especially so because the prior statements to the police were obtained while Marvin was in the hospital for extensive injuries from the gunshots—a hospitalization the jury knew had lasted for 50 days, during which six different surgeries were performed.

Moreover, because defense counsel was able to question Marvin about his statements to police by including some of the contents of those statements in the questions posed, the jury was not only aware Marvin made inconsistent statements to the police, they knew Marvin told police that on the day of the shooting he had walked up to defendant's house, asked him to quit flying his drone, and was simply walking away when he was shot. The jury knew Marvin had not been accurate in his police statements at the hospital; the core credibility value of the prior inconsistent statements was placed before the jury. Under these circumstances, even assuming the trial court erred under state law by precluding the defense from playing the interview recording, it did not violate defendant's Sixth Amendment right to confrontation.

Finally, the exclusion of evidence did not violate defendant's right to due process because it did not render the trial fundamentally unfair. (*Quartermain, supra*, 16 Cal.4th at p. 626.) Despite the exclusion of the recorded interview, the jury knew about the most salient inconsistent statement Marvin made during that interview; those inconsistencies were of marginal impeachment value; and they were not substantively helpful to defendant's self-defense theory.

23.

The jury knew Marvin's police statements were inconsistent with the version of events he gave at trial, and they knew the specific content of the most central of those inconsistencies—that Marvin had told police he had merely asked defendant to stop flying his drone and was shot while walking away. Moreover, Marvin's credibility was not the centerpiece of the prosecution's case. Several other witnesses corroborated Marvin's trial testimony, and Marvin admitted his memory of the shooting was limited.

The inconsistent statements were not substantively helpful to the defense case, either. The witness testimony made clear Marvin instigated the verbal confrontation that led to the shooting, and he had been over to defendant's house earlier in the day swearing at defendant over the use of the drone. He was angry during the argument with defendant, and even Ellen admitted she told a deputy she had been afraid that her efforts to get Marvin to back down would make Marvin angrier. Marvin also had prior convictions for assault with a deadly weapon, spousal battery, evading an officer, and a conviction for false imprisonment that Marvin could not remember. That evidence was much more compelling as to defendant's self-defense theory than the prior inconsistent statements Marvin made to police while he was hospitalized, the most salient of which defendant was able to present to the jury during Marvin's cross-examination anyway. On this record, the fact the jury did not hear the interview recording did not render defendant's trial fundamentally unfair.

### 2. Assumed Error Under State Law Not Prejudicial

Having concluded any assumed error of state law was not of constitutional magnitude, we turn to the claimed evidentiary error under state law. Under California state law, a witness's prior inconsistent statements are not inadmissible under the hearsay rule so long as the requirements of Evidence Code section 770 are met. (Evid. Code, §§ 770, 1235.) For prior inconsistent statements to be admissible, Evidence Code section 770 requires either "[t]he witness was so examined while testifying as to give him

an opportunity to explain or to deny the statement" (*id.*, subd. (a)), or "[t]he witness has not been excused from giving further testimony in the action" (*id.*, subd. (b)).

Marvin's prior statements to police, as discussed in the lengthy bench conference held outside the presence of the jury, were inconsistent with his trial testimony in two salient respects. First, he told officers he had never met defendant before he told him to stop flying his drone and was shot; contrarily, in his trial testimony he stated he had gone to defendant's house in his truck before he later walked to defendant's house and the shooting ensued. He also indicated at trial that defendant had driven by Joe's house before the shooting and yelled at Marvin, calling him and Joe unpleasant names. Second, as articulated by counsel at the bench conference, Marvin told police he had started walking away from defendant when he was shot. In his trial testimony, he clearly indicated he was involved in a verbal argument with defendant and was facing defendant when he was shot—Marvin freely acknowledged his bullet wounds were to the front of his torso, and any injury to his back was caused by bullet exit wounds.

When Marvin was asked about his statements to police, Marvin indicated he could not remember the interview at all. During the bench conference, the court concluded the portion of the interview where Marvin indicated he was shot while walking away from defendant could be read into the record, but declined to allow defense to play the recorded interview for the jury in its entirety. That ruling is reviewable under the abuse of discretion standard. (*People v. Peoples* (2016) 62 Cal.4th 718, 745.)

We dispense with an analysis of whether the trial court abused its discretion in excluding some or all of the interview recording because, even if all of the prior inconsistent statements in Marvin's recorded interview that defense counsel pointed to had been played for the jury, there is no reasonable probability it would have resulted in a more favorable outcome for defendant. (*People v. Watson* (1956) 56 Cal.2d 818, 837 (*Watson*) [reviewing court must affirm if it is "not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error"]; *People v.*

25.

*Boyette, supra*, 29 Cal.4th at p. 429 [trial court's erroneous exclusion of evidence that does not impinge on constitutional rights is reviewed under the standard of prejudice adopted in *Watson*].)

As noted, defense counsel was able to question Marvin about the fact he inconsistently told police in the interview that Marvin had merely gone over to ask defendant not to fly the drone, and that when Marvin had turned to walk away from defendant, he was shot. The jury was therefore well aware defendant made prior inconsistent statements about how the shooting occurred and the nature of those inconsistencies, and they were able to compare those inconsistencies with Marvin's trial testimony. As such, the most salient credibility value of these inconsistent statements was realized through cross-examination.

According to the sidebar discussions, during his police interview Marvin was unable to identify defendant in a photo lineup. The court pointed out defendant's identity was not a relevant issue in the case, but defense counsel argued it was relevant to show Marvin had a poor memory of the events generally. Yet, Marvin repeatedly indicated in his testimony he had a limited memory of the events. The jury, therefore, had other evidence indicating Marvin's memory of the shooting was less than fully trustworthy at trial. Marvin's prior inconsistent interview statements did not meaningfully add to what the jury already knew about Marvin's poor memory of the events.

Also, Marvin's prior inconsistent interview statements were less favorable to the defense than Marvin's trial testimony. Other than their limited credibility impact, those inconsistent statements did nothing substantive to support defendant's self-defense theory. And, Marvin's credibility was not pivotal to the prosecution's case because there were multiple other eye witnesses whose testimony the jury could evaluate; many of these witnesses largely corroborated Marvin's version of events.

As for the specific credibility impact on Marvin's testimony that he never hit Mary or advanced physically on defendant at any time during their argument, the jury had

other, more compelling evidence to consider in support of defendant's self-defense theory. Marvin's trial testimony, along with all the other witnesses, indicated Marvin instigated the verbal altercation that led to the shooting, and confirmed Marvin was facing defendant when he was shot, rather than walking away from defendant as the jury knew Marvin told officers at the hospital. Indeed, Marvin acknowledged all the bullets were fired into the front of his torso—any injury to his back was an exit wound. The jury also knew Marvin had been drinking before the fight; that Marvin was extremely agitated and angry during the argument with defendant—yelling, threatening, and using foul language; and even Marvin's wife told a deputy she was worried about angering him further. Additionally, the jury knew Marvin had prior convictions establishing he had been physically aggressive with others in the past. All of this was far more relevant and compelling to support the defense theory of self-defense than the prior inconsistent statements, and those inconsistent statements did not add meaningfully to this evidence.

In sum, Marvin's prior inconsistent statements in his police interview were of negligible value when considering the whole trial record, both in terms of Marvin's credibility and the actual course of events during the shooting. Given this, there was no reasonable probability playing the police interview recording would have resulted in a more favorable outcome for defendant.

## III. Inability-to-pay Claim Pursuant to *Dueñas*

On May 30, 2019, defendant was sentenced to an aggregate term of nine years. Defendant was ordered to pay restitution under section 1202.4, subdivision (f), in an amount to be determined by the probation department; a $300 restitution fine under section 1202.4, subdivision (b), with a corresponding and suspended $300 fine under section 1202.45; a $30 court facilities assessment under Government Code section 70373; and a $40 court operations assessment under section 1465.8. No objection to these fines and assessments was interposed.

27.

Defendant challenges the $300 restitution fine under section 1202.4, subdivision (b), and the $70 assessments under section 1465.8 and Government Code section 70373. Defendant argues that pursuant to *Dueñas*, the imposition of the assessments and the restitution fine without a hearing on his inability to pay violates defendant's federal and state constitutional rights. Defendant maintains we should strike the assessments imposed by the trial court, suspend the restitution fine, and remand for a hearing to determine defendant's inability to pay.

### A. *Dueñas*

The *Dueñas* panel held that Government Code section 70373 and Penal Code section 1465.8 are fundamentally unfair and violate due process under the federal and state Constitutions when imposed upon indigent defendants without a determination of the "present ability to pay." (*Dueñas, supra*, 30 Cal.App.5th at p. 1168.) The court noted the assessment statutes were enacted to raise funds for the state courts and were not intended to be punitive. (*Id.* at p. 1165.) Nevertheless, the court reasoned, when imposition of these fines created mounting criminal justice debts from unpayable assessments, the statutes are transformed from a court-funding mechanism into additional punishment on those criminal defendants who could not pay. (*Id.* at p. 1168.) Relying on the constitutional principles of fair and equal treatment before the law for indigent defendants, as discussed in *Griffin v. Illinois* (1956) 351 U.S. 12, *In re Antazo* (1970) 3 Cal.3d 100, and *Bearden v. Georgia* (1983) 461 U.S. 660, the court concluded the assessments were fundamentally unfair if imposed without a determination whether the defendant has the ability to pay. (*Dueñas, supra*, at p. 1168.)

Addressing the restitution fine separately, the court reasoned that, although a restitution fine is intended as additional punishment for a crime, section 1202.4 expressly disqualifies inability to pay as a basis for waiving the fine. (*Dueñas, supra*, 30 Cal.App.5th at pp. 1169–1170.) The court found this provision at odds with the statutory policy requiring restitution to be consistent with a person's ability to pay (§ 1203.2,

28.

subd. (a)) and with common law principles that consider a defendant's financial circumstances when imposing a punitive award. (*Dueñas, supra*, at pp. 1169–1170.) The court also observed an indigent defendant is not afforded the same relief at probation completion as those defendants who can pay their restitution fine—those unable to pay do not have the right to have the charges dropped and to be free from the penalties of the offense for which they are on probation. (*Dueñas, supra*, at pp. 1170–1171.) The court concluded this limits the rights of those unable to pay and is fundamentally unfair. (*Id.* at p. 1171.) To avoid a constitutional dilemma, the court held that, while section 1202.4 required imposition of a restitution fine, the trial court must suspend execution of the fine "until and unless the People demonstrate that the defendant has the ability to pay the fine." (*Dueñas, supra*, at p. 1172.)

### B.     Claim Under *Dueñas* Has Been Forfeited

Defendant was sentenced on May 30, 2019, which was nearly five months after the Court of Appeal issued its decision in *Dueñas*. Although defendant did not have a statutory right to object to imposition of the minimum $300 restitution fine under section 1202.4, the parties and the trial court had ample notice of the *Dueñas* decision.

Defendant argues "the claimed error implicates [his] fundamental constitutional rights and it should not be subject to the traditional forfeiture rules," and he argues we have the inherent authority to consider a forfeited claim. However, the failure to object in the trial court generally forfeits a claim on appeal, and this principle is applicable to constitutional claims. (*People v. McCullough* (2013) 56 Cal.4th 589, 593; *In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.) Moreover, "'discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue'" (*In re Sheena K., supra*, at p. 887, fn. 7). Here, as stated, defendant had ample notice prior to sentencing of the appellate decision on which he now relies to advance his constitutional claim. Defendant's inability-to-pay claim has been forfeited.

## C.  No Ineffective Assistance of Counsel Established

In anticipation of our conclusion that he forfeited his appellate claim under *Dueñas* by failing to object at sentencing on the ground he had an inability to pay the fines and assessments imposed, defendant alternatively argues his counsel's performance was constitutionally ineffective in failing to challenge the fine and assessments at sentencing.  Defendant argues generally there could be no satisfactory explanation for his counsel's failure to object to the imposition of the assessments and restitution fine, and that had the objection been made, the trial court likely would have found defendant unable to pay them.

"'[A] defendant claiming a violation of the federal constitutional right to effective assistance of counsel must satisfy a two-pronged showing:  that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.'" (*People v. Woodruff* (2018) 5 Cal.5th 697, 736, quoting *People v. Alexander* (2010) 49 Cal.4th 846, 888; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Mickel* (2016) 2 Cal.5th 181, 198.)  To establish deficient performance, defendant must show that counsel's performance "fell below an objective standard of reasonableness under prevailing professional norms."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009; accord, *Strickland v. Washington, supra*, at pp. 687–688; *People v. Mickel, supra*, at p. 198.)  The burden lies with the defendant to show inadequate or ineffective representation, and the proof "'must be a demonstrable reality and not a speculative matter.'" (*People v. Karis* (1988) 46 Cal.3d 612, 656.)

In the context of a direct appeal, we examine the record to see if there is any explanation for the challenged aspects of representation.  (*People v. Mai, supra*, 57 Cal.4th at p. 1009.)  If the reasons for defense counsel's actions are not readily apparent from the record, we will not assume constitutionally inadequate representation and

reverse a conviction unless the record discloses no conceivable tactical purpose for counsel's act or omission. (*Ibid.*)

The challenged fine and assessments total $370. The record shows defendant was born in 1984 and was 34 years old at the time of sentencing. He was employed at the time of his arrest with a fairly substantial monthly income noted in his probation report. Defendant is a relatively young man, and his prison term is limited to nine years. Since defendant was gainfully employed prior to his conviction, suffers no physical disabilities, and is serving a determinate term of less than 10 years, the record implies a reason why counsel may not have objected to the $370 fine and assessments—defendant has the ability to pay. As there is a conceivable reason for counsel's failure to object to imposition of the $370, defendant has not established any deficient performance by his counsel.

Moreover, without any evidence showing defendant's inability to pay $370, defendant has not established any prejudice resulting from the failure to object to the fines and assessments.

## DISPOSITION

The judgment is affirmed.



MEEHAN, J.

WE CONCUR:


LEVY, Acting P. J.


SMITH, J.


31.